IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 16-cv-03024-MSK

YVONNE SPOMER,

    Plaintiff,

v.

NANCY BERRYHILL, Acting Commissioner of the Social Security Administration,

    Defendant.

## OPINION AND ORDER REVERSING AND REMANDING DISABILITY DETERMINATION

**THIS MATTER** comes before the Court as an appeal from the Commissioner's Final Administrative Decision ("Decision") determining that the Plaintiff Yvonne Spomer is not disabled under the Social Security Act. Having considered all of the documents filed, including the record (**#10**), the Court now finds and concludes as follows:

### JURISDICTION

The Court has jurisdiction over an appeal from a final decision of the Commissioner under 42 U.S.C. § 405(g). Ms. Spomer sought disability insurance benefits under Title II of the Social Security Act based on mental and physical impairments that rendered her unable to work as of January 4, 2013. The state agency denied her claim. She requested a hearing before an Administrative Law Judge ("ALJ"), who issued an unfavorable decision. Ms. Spomer appealed to the Appeals Council, which denied her request for review, making the ALJ's determination the final decision of the Commissioner. Ms. Spomer timely appealed to this Court.

1

**STATEMENT OF FACTS**

The Court offers a brief summary of the facts here and elaborates as necessary in its analysis.

Ms. Spomer was born July 8, 1971. She graduated from high school and took several college classes without obtaining a degree. She has worked in unskilled positions which include housecleaning, janitorial services, vending, and caregiving. She contends that mental and physical impairments prevent her from working on a full-time basis.

Ms. Spomer suffers from multiple mental and physical impairments. Her mental health providers have diagnosed her with bipolar disorder, posttraumatic stress disorder, dependent personality disorder, mood disorder, anxiety disorder, depression, and mathematic disorder/executive functioning issues. Additionally, she is obese and suffers from temporomandibular joint disorder, osteoarthritis, insomnia, and migraine headaches.

**Treatment and Opinions by Treating Professionals**

Ms. Spomer began receiving mental health treatment as a teenager on an infrequent basis. In 2010, she was hospitalized because she was having suicidal thoughts, and she was then prescribed lithium. In approximately 2012, she began receiving regular mental health treatment through her primary care physician Chris Keenan, M.D., Rachel Shannon, a licensed clinical social worker, and Susan Mitchell, a nurse practitioner, both of whom worked for Clinica in Lafayette, Colorado. By April 2013, Ms. Spomer had not experienced significant improvement and complained that none of the medications she had received were effective. In November 2013, Dr. Keenan filled out a Colorado Department of Human Services Med-9 Form and opined that Ms. Spomer's emotional state, depression with suicidal thoughts, and manic episodes rendered her disabled for a period of six months or longer.

In addition to providing mental health treatment, Dr. Keenan treated Ms. Spomer for a variety of chronic physical impairments, including migraine headaches, jaw pain, knee pain, insomnia, and obesity. However, he did not provide a medical source statement as to the impact Ms. Spomer's physical impairments had on her ability to work.

Dr. Keenan referred Ms. Spomer to Mental Health Partners for specialized mental-health treatment, and in August 2013, she began receiving treatment there. Juan Contreras, a licensed professional counselor, performed an extended assessment; then she received counselling from Marilee Snyder, a licensed clinical social worker. Jule McClaughlin, a physician's assistant, managed her medications.

After treating Ms. Spomer for about one-and-one-half years, Ms. Snyder filled out a questionnaire concerning Ms. Spomer's mental health symptoms in support of her disability claim. She noted that Ms. Spomer is morbidly obese and physically inactive, and reports that she suffers from insomnia and restless sleep. Ms. Snyder observed that Ms. Snyder had a blunt, flat, or inappropriate affect and had an inability to function outside a highly supportive living arrangement; had moderate symptoms of being depressed or having an irritable mood, had diminished interest or please in almost all activities, was fatigued or had a loss of energy, had unstable interpersonal relationships, had difficulty in maintaining social functioning, concentration, persistence, or pace, having short or long term memory loss, having problems with social interactions, and having mood or affect disturbances; and manifested extreme symptoms of having feelings of worthlessness or guilt, having difficulty thinking or concentrating, having deeply ingrained, maladaptive patterns of behavior, having pathological dependence and passivity, and being emotionally withdrawn and/or isolated.

Patrick Bushard, M.D., a neurologist, provided Ms. Spomer with treatment to address her

3

migraine headaches. He treated her with Botox injections and prescribed sumatriptan. However, he did not provide a medical source statement as to the impact Ms. Spomer's migraine headaches had on her ability to work.

**Opinions by Non-treating Professionals**

Mark G. Pendleton, Ph.D., a clinical psychologist and neuropsychologist, performed a neuropsychological evaluation. He performed a two-day examination in order to "(1) determine the nature and extent of any organically-based cerebral dysfunction; (2) discuss the implications of the test results for her everyday functioning; and (3) assist with treatment planning." Dr. Pendleton found that Ms. Spomer's processing speed, nonverbal memory processing, and academic skills, except math, were all normal; her motor control, verbal memory processing, and visuospatial processing were either borderline normal or very mildly impaired; her sensory processing, language processing, and reasoning abilities were all mildly impaired; and her attentional processes and executive functions were mildly to moderately impaired. Based on her testing, Dr. Pendleton opined that Ms. Spomer was neurologically impaired with mild, bilateral cerebral dysfunction and that her cognitive functioning has been declining. He diagnosed her with Cognitive Disorder NOS and Mathematics Disorder. He then opined that these conditions rendered her only marginally able to maintain employment.

Stuart Kutz, Jr., Ph.D. performed a psychological consultative examination. He opined that Ms. Spomer's abilities to understand and remember complex instructions, to carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with coworkers, and to respond appropriately to usual work situations and to changes in a routine work setting were mildly impaired; and her abilities to interact appropriately with the public and with supervisors were moderately impaired.

Linda Mitchell, M.D., performed a medical consultative examination. She found that Ms. Spomer suffered from joint effusion and mild osteoarthritis and diagnosed her with morbid obesity, right patellofemoral chondromalacia/osteoarthritis, hypothyroidism, and hypertension. She opined that Ms. Spomer could stand or walk for two hours in an eight-hour workday without limitation on the number of hours she could sit; she could pull through or carry weight in the range of twenty to fifty pounds; and she could climb stairs occasionally. She recommended that Ms. Spomer avoid squatting, crouching, stooping, and kneeling and avoid unprotected heights and ladders. She did not recommend any manipulative limitations or assistive devices.

Dr. Anthony Gottlieb, the state agency medical consultant, reviewed Ms. Spomer's file but did not examine her. He opined that Ms. Spomer's bipolar disorder mildly restricted her activities of daily living, caused her moderate difficulties in maintaining social functioning, concentration, persistence, and pace, but did not cause repeated episodes of decompensation for extended durations. He further opined that Ms. Spomer was moderately limited her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, to compete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. In conclusion, he opined,

> [Ms. Spomer] can follow simple instructions, sustain ordinary routines and make simple work related decisions; cannot work closely with supervisors or coworkers; can accept supervision and relate to coworkers if contact is not frequent or prolonged. She should have minimal to no contact with the general

5

public.

Symptoms may interfere with completion of a normal workday or workweek or may cause inconsistent pace. However, when work does not require more than simple instructions, ordinary routines and simple work decision making, limitations of attendance and pace will not prevent the completion of a normal workday/workweek or significantly reduce pace. Claimant can perform at a consistent pace without an unreasonable number and length of rest periods when work demands are within MRFC restrictions.

## THE ALJ'S DECISION

The ALJ analyzed Ms. Spomer's case pursuant to the sequential five-step inquiry. At step one, the ALJ found that Ms. Spomer had not worked or engaged in substantial gainful activity from the date she applied for disability benefits, January 4, 2013. At step two, the ALJ found Ms. Spomer had medically severe impairments of obesity, depression, mood disorder NOS, bipolar disorder, anxiety disorder, and mathematic disorder/executive functioning issues. At step three, the ALJ found that Ms. Spomer's impairments did not equal the severity of a listed impairment in the appendix of the regulations. At step four, the ALJ first assessed Ms. Spomer's Residual Functional Capacity ("RFC") and determined that:

> [Ms. Spomer] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she can only occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; and cannot work at hazardous heights. She is able to understand and carry out simple routine tasks and can have rare interaction with the public and occasional interaction with coworkers and supervisors.

The ALJ then found that Ms. Spomer has no past relevant work. However, at step five, the ALJ found that Ms. Spomer could perform jobs that exist in significant numbers in the national economy, and thus, she was not disabled.

## ISSUES PRESENTED

Ms. Spomer nominally raises six objections to the ALJ's decision. The objections fall in one of four categories: (1) the ALJ failed to follow governing law when assigning weight to the

opinions of treating and non-treating medical professionals; (2) the ALJ improperly assessed Ms. Spomer's credibility as to the statements she made to medical professionals and to the ALJ; (3) the ALJ improperly reviewed Ms. Spomer's impairments when determining whether they were severe and whether they, in combination, rendered her disabled; and (4) the ALJ ignored evidence supporting Ms. Spomer's disability claim.

## STANDARD OF REVIEW

On appeal, a reviewing court's judicial review of the Commissioner of Social Security's determination that a claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the Commissioner's decision is supported by substantial evidence. *Hamilton v. Sec'y of Health &Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992); *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990); *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003). If the ALJ failed to apply the correct legal standard, the decision must be reversed, regardless of whether there was substantial evidence to support factual findings. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). In determining whether substantial evidence supports factual findings, substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. *Brown*, 912 F.2d at 1196; *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). It requires more than a scintilla but less than a preponderance of the evidence. *Lax*, 489 F.3d at 1084; *Hedstrom v. Sullivan*, 783 F. Supp. 553, 556 (D. Colo. 1992). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Although a reviewing court must meticulously examine the record, it may not weigh the evidence or substitute its discretion for that of the Commissioner. *Id.*

**ANALYSIS**

Ms. Spomer argues that the ALJ failed to properly consider or completely ignored the opinions of Dr. Pendleton, Ms. Snyder, Dr. Keenan, Mr. Contreras, Ms. Shannon, Dr. Bushard, and Dr. Kutz. The Court will only address the ALJ's treatment of Dr. Pendleton's opinions because it requires reversal and remand of this matter.

The weight an ALJ should give to medical opinion evidence depends on a number of factors. A medical opinion provided by a treating physician must be given controlling weight if (1) it is well supported by medically acceptable clinical and laboratory diagnostic techniques and (2) it is consistent with the other substantial evidence in the record. *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007). If either of these requirements is not satisfied, then the opinion is not accorded controlling weight, but its relative weight must still be assessed in comparison to other medical opinions in the record. *Drapeau v. Massanri*, 255 F.3d 1211, 1213 (10th Cir 2001). The factors considered for assessing the weight of all medical opinions other than those entitled to controlling weight are as follow:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Allman v. Colvin*, 813 F.3d 1326, 1331–32 (10th Cir. 2016). None of these factors are controlling; not all of them apply to every case, and an ALJ need not expressly discuss each factor in his or her decision. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, "the record must reflect that the ALJ *considered* every factor in the weight calculation." *Andersen v. Astrue*, 319 Fed. App'x 712, 718-19 (10th Cir. 2009)(*emphasis* in original). Finally,

the ALJ must provide legitimate, specific reasons for the relative weight assigned. *Langley*, 373 F.3d at 1119.

As discussed above, Dr. Pendleton found that Ms. Spomer's math processing, motor control, verbal memory processing, visuospatial processing, sensory processing, language processing, reasoning abilities, attentional processes, and executive functions were impaired to some degree. He then opined that Ms. Spomer suffered from neurological impairments, including mild cerebral dysfunction, declining cognitive dysfunction, Cognitive Disorder NOS, and Mathematics Disorder. He further stated,

> [Ms. Spomer's] overall level of cognitive functioning on this neuropsychological battery (AIR = 1.73) is within the range (AIR > 1.60) characteristic of previous patients who have not been able to obtain and hold competitive employment. From even just a cognitive ability point of view (not considering additional issues associated with emotional and physical functioning), she should be considered only marginally capable of employment, even if she takes careful steps to inform her employer and to compensate for cognitive difficulties.

The ALJ gave his opinion little weight stating, "Dr. Pendleton based this opinion a one-time, two-day exam in a setting with the claimant who has credibility concerns."

Dr. Pendleton is not a treating physician whose opinion should be given controlling weight. However, the ALJ's explanation as to the weight given to his opinions overlooks the obligation to show that she considered the above-listed six factors. Indeed, the ALJ does not discuss or even list the six factors anywhere in the Decision. This is legal error. *See Andersen*, 319 Fed. App'x at 718-19. But if the reasons articulated by the ALJ constitute legitimate reasons for giving Dr. Pendleton's opinions little weight, then the error is harmless. Thus, the Court considers whether the reasons given by the ALJ are sufficient for the determination that Dr. Pendleton's opinions are only entitled to little weight.

The Court first addresses the ALJ's reference to "credibility concerns". Rather than evaluating medical opinions based on established legal standards, the ALJ first decided whether

9

Ms. Spomer was believable and then let that perception drive the outcome of the matter. In doing so, the ALJ erred.

In determining disability claims, the existence and the extent of an impairment is determined by considering evidence of "signs" and "symptoms." *See* 20 CFR § 404.1529 & 416.929. "Signs" are objective, medically recognized facts that can be described, evaluated, and documented using acceptable clinical, diagnostic, or laboratory techniques. *See id*. Medical facts are reported in tests and treatment notes, and serve as the basis of medical opinions as to diagnosis, prognosis, and functional capability and limitation. For example, the results of a blood test may indicate diabetes, or clinical observation may show signs of muscle strain.

In the psychiatric/psychological context there may be no laboratory or test results that measure mental disease. Thus, with regard to psychological or mental impairments, medical signs are demonstrable phenomena indicating psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception. *See* 20 C.F.R. Subpart P, App 1 § 12.00(B). Observations of medical signs by clinicians constitute medical data, and to the extent that an opinion with regard to psychological or mental impairment rests on clinically-observed signs and reported symptoms, the opinion is treated as any other medical opinion. 20 C.F.R. Subpart P, App 1 § 12.00(B); *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir.2004); *Washington v. Shalala*, 37 F.3d 1437, 1441 (10th Cir. 1994).

"Symptoms," in contrast, are observations or descriptions made by a claimant with regard to an impairment or how the impairment affects him or her. *See* 20 CFR § 404.1529 & 416.929. By definition, symptoms are subjective and most often cannot be measured or tested. They often include pain, fatigue, weakness, nervousness, and the like.

Not surprisingly, "signs" and "symptoms" are evaluated using different frameworks. Signs are evaluated by medical professionals based on professional standards, while symptoms are evaluated by the ALJ in order to determine the degree of impairment. A claimant's credibility is pertinent only as to statements about his or her symptoms, and then only to assess the intensity, persistence, and functional limitations of such symptoms. 20 CFR §§ 404.1529 & 416.929. The credibility determination is not a free-form judgment of whether the claimant is truthful in general, but instead requires a structured consideration of the relationship between the objective medical facts and the subjective symptoms. *See* SSR 96-7p, 1996 WL 374186 at *4-*5.[1] Accordingly, an ALJ is not free to substitute his/her assessment of a claimant's credibility as to symptoms in weighing the medical professional's assessment of signs. *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (citing *Morales v. Apfel,* 225 F.3d 310, 317-18 (3d Cir. 2000)).

In *Valdez v. Barnhart*, 62 Fed. App'x 838 (10th Cir. 2003), the Tenth Circuit considered facts similar to those presented here. The ALJ rejected opinions of physicians with regard to the claimant's mental impairments based on an assessment of the credibility of the claimant's symptom description. The Tenth Circuit reversed the Commissioner's decision to deny benefits, finding that that the ALJ erred in applying the correct legal standard. It observed:

> The ALJ rejected Dr. Schmidt's opinion, stating that it was based on plaintiff's complaints, which the ALJ found were not credible. This approach impermissibly put the ALJ in the position of judging a medical professional on how he should assess medical data — plaintiff's complaints. An ALJ may not substitute his lay opinion for a medical opinion.

*Id*. at 842.

---

[1] SSR 96-7p was rescinded on March 16, 2016, after the ALJ issued the Decision. *See* SSR 16-3p, 2016 WL 1119029. When explaining its reasons for rescinding SSR 96-7p, the Social Security Administration stated, "[W]e are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character."

In the present case, Dr. Pendleton evaluated Ms. Spomer's neuropsychological state using four procedures:

(1) Intake interview and Patient Information Form.

(2) An expanded Halstead-Reitan neuropsychologicol battery for adults (ages 15 years and above) was administered. The Reiton and Wolfson (1993) norms, and the Heaton, Miller, Taylor, 8. Grant (2004) revised comprehensive norms, were used in evaluating these test results.

(3) Ms. Spomer completed the Patient's Assessment of Own Functioning Inventory (PAF) with an appended Problem Checklist.

(4) The patient's ex-husband completed [the] Relative's Assessment of Patient Functioning Inventory (RAF).

R. 480. The tests administered under the expanded Halstead-Reitan neuropsychological battery evaluated Ms. Spomer's motor control, sensory perception, attentional processes, processing speed, executive functions, memory, visuospatial abilities, language abilities, academic aptitude/achievement, and reasoning abilities. R. 481-83. These tests contain "embedded measures that are sensitive to level of effort", and based on those measures Dr. Pendleton found that Ms. Spomer's test results accurately reflected her mental capabilities but that emotional and behavioral factors affected her working memory. R. 480.

Undoubtedly, Dr. Pendleton considered Ms. Spomer's statements to him in light of the tests he administered and other information. When the ALJ discounted Dr. Pendleton's opinions because the ALJ did not believe Ms. Spomer, the ALJ impermissibly substituted her own opinion for that of Dr. Pendleton. This was improper, and does not constitute a legitimate basis for weighing Dr. Pendleton's opinion.

The alternative reason the ALJ gave for assigning Dr. Pendleton's opinion little weight is that it is based on a single, two-day examination. Admittedly, the length of treatment and frequency of examination are valid considerations when determining what relative weight to give

a non-controlling medical opinion. But the ALJ's assessment on this basis implicitly suggests that opinions based on more than a single, two-day examination would be entitled to greater weight.

That is not the case, however. Ms. Spomer provided the ALJ with medical evidence from multiple sources, two of whom were from Dr. Keenan and Ms. Snyder. At the time of the Decision, Dr. Keenan had been treating Ms. Spomer for at least three years, and Ms. Snyder had been treating her for almost two years. Notwithstanding this significant longitudinal relationship, the ALJ determined that their opinions were entitled to only little weight. R. 34-35. In comparison, Dr. Gottlieb's opinions based on only a review of Ms. Spomer's medical records were given great weight and incorporated into the RFC. The ALJ does not articulate a reason to justify this disparate treatment. Giving little weight to an examining source's medical opinion because it is based on a single examination while adopting a non-examining source's medical opinion is "particularly curious, perhaps even disingenuous." *Davis v. Astrue*, Case No. 09-cv-00881-REB, 2010 WL 3835828 at *4 (D. Colo. Sept. 23, 2010)(unpublished).

For the foregoing reasons, the Court finds that the Decision fails to demonstrate application of the correct legal standard governing the evaluation of a non-treating physician's opinion, and the ALJ's reasons for assigning little weight to Dr. Pendleton's opinion are not legitimate. Because these errors require reversal and remand for further proceedings, the Court need not address Ms. Spomer's remaining arguments. *See Madrid v. Barnhart*, 447 F.3d 788, 792 (10th Cir. 2006).

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **REVERSED** and this matter is **REMANDED** to the ALJ for further proceedings. The Clerk shall enter a judgment in this

matter.

**Dated this 23rd day of March, 2018**

                                            **BY THE COURT:**

                                        Marcia S. Krieger
                                        United States District Court